In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 13-1264

JAMES M. SWEENEY, et al.,

*Plaintiff-Appellants,*

*v.*

MICHAEL PENCE,
Governor of the State of Indiana, et al.,

*Defendant-Appellees.*

---

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:12-cv-00081-PPS-PRC — **Philip P. Simon**, *Chief Judge.*

---

ARGUED SEPTEMBER 12, 2013 — DECIDED SEPTEMBER 2, 2014

---

Before WOOD, *Chief Judge*, and MANION and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Plaintiff-Appellants, members and officers of the International Union of Operating Engineers, Local 150, AFL-CIO ("the Union") appeal the district court's dismissal of their suit, arguing that the Indiana Right to Work Act violates their rights under the United States Constitution and is preempted by federal labor legislation. Be-

cause the legislation is not preempted by the scheme of federal labor law and does not violate any constitutional rights, we affirm the district court's dismissal of the suit.

**I**

After a "rancorous, partisan" month-long fight during which "hundreds of union members crowded, day after day, into the Statehouse halls,"[1] the Indiana legislature passed the Indiana Right to Work Act on February 1, 2012, and Governor Mitch Daniels signed the legislation into law. The law's relevant provisions for this litigation are the following.

**Section 8,** which spells out the principal prohibitions of the Right to Work Act:

> A person may not require an individual to:
>
> (1) Become or remain a member of a labor organization;
>
> (2) Pay dues, fees, assessments, or other charges of any kind or amount to a labor organization; or
>
> (3) Pay to a charity or third party an amount that is equivalent to or a pro-rata part of dues, fees, assessments or other charges required of members of a labor organization

---

[1] Monica Davey, "Indiana Governor Signs a Law Creating a 'Right to Work' State," N.Y. TIMES (Feb. 2, 2012) at A12, available at http://www.nytimes.com/2012/02/02/us/indiana-becomes-right-to-work-state.html (last accessed Aug. 20, 2014).

> as a condition of employment or continuation of employment.

IND. CODE § 22-6-6-8.

**Section 3**, which makes clear what substantive provisions of the Right to Work Act are to be construed to apply to the building and construction industry:

> Nothing in this chapter is intended, or should be construed, to change or affect any law concerning collective bargaining or collective bargaining agreements in the building and construction industry other than:
>
> (1) a law that permits agreements that would require membership in labor organization;
>
> (2) a law that permits agreements that would require the payment of dues, fees, assessments, or other charges of any kind of amount to a labor organization; or
>
> (3) a law that permits agreements that would require the payment to a charity or a third party of an amount that is equivalent to or a pro rata part of dues, fees, assessment, or other charges required of members of a labor organization;
>
> as a condition of employment.

IND. CODE § 22-6-6-3.

And **Section 13**, which makes clear that Sections 8-12 of the Act apply prospectively:

Sections 8 through 12 of this chapter:

> (1) apply to a written or oral contract or agreement entered into, modified, renewed, or extended after March 14, 2012; and

> (2) do not apply to or abrogate a written or oral contract or agreement in effect on March 14, 2012.

IND. CODE § 22-6-6-13.

On February 22, 2012, Plaintiff-Appellants, officers and members of the International Union of Operating Engineers, Local 150, AFL-CIO ("the Union"), brought suit in federal district court against the Governor of Indiana, the Attorney General of Indiana, and the Commissioner of the Indiana Department of Labor in their official capacities, seeking declaratory relief. They alleged that the Indiana Right to Work Act violates the United States Constitution and the Indiana Constitution. They further argued that the scheme of federal labor law, specifically the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, preempts §§ 8(2)–(3) and 3(2)–(3) of the new legislation. On January 17, 2013, the federal district court granted Defendant-Appellees' Motion to Dismiss on the preemption claim and the federal constitutional claims. Plaintiff-Appellants timely appealed.[2]

---

[2] We briefly note that there is parallel litigation pending in the Indiana state courts. Two decisions have been issued by state trial courts in rela-

Continued on next page

## II

On appeal, Plaintiff-Appellants raise two varieties of issues: whether the law is preempted by the federal scheme of labor law, and whether the Indiana law violates the United States Constitution. We answer in the negative to both questions.

### 1. Federal Preemption

Plaintiff-Appellants' main argument asserts that the Indiana right-to-work law is preempted by federal legislation on the same topic.

The history of the federal legislation in question is important here. Congress enacted the Wagner Act in 1935 and amended it through the Labor Management Relations Act of 1947, better known as the Taft-Hartley Act. The Taft-Hartley Act included several provisions intended to ameliorate perceived imbalances in the NLRA. In particular, Congress was concerned about abuses stemming from the "closed shop," a union-security agreement whereby an employer agreed to

---

tion to the statute: in a case in Lake County Superior Court brought by, *inter alia*, the Plaintiff-Appellants (Order, *Sweeney v. Zoeller*, No. 45D01-1305-PL-52 (Lake Cnty. Super. Ct. Sep. 9, 2013), Docket No. 23), and in a separate case in Lake County Circuit Court brought by members of another union (Order, *United Steel Paper v. Zoeller*, No. 45C01-1207-PL-00071 (Lake Cnty. Cir. Ct. Jul. 17, 2014)). Both decisions have been appealed to the Indiana Supreme Court. (Docket Records of *Zoeller v. Sweeney*, No. 45 S 00 – 1309 – PL – 00596 (accessed Aug. 20, 2014); Docket Records of *Zoeller v. United Steel Paper*, No. 45 S 00 – 1407 – PL – 00492 (accessed Aug. 20, 2014)). The state trial courts' decisions are far from final in most respects, and, moreover, have no preclusive effect on our consideration of federal questions here.

hire only union members. Section 8(3) of the Wagner Act was accordingly amended to ban closed shops. However, the amended Section 8(3) "shield[ed] from an unfair labor practice charge less severe forms of union-security arrangements than the closed or union shop." *NLRB. v. Gen. Motors Corp.*, 373 U.S. 734, 739 (1963). For example, it permitted "an arrangement … requiring nonunion members to pay to the union $2 a month 'for the support of the bargaining unit.'" *Id.*

Although Congress permitted less restrictive, post-hiring union-security agreements under federal law, it also left states free to ban them. Section 14(b) of the Act provided that Section 8(3) did not protect a union-security agreement if it was "prohibited by State or Territorial law." By the time Section 14(b) was included in the NLRA, "twelve States had statutes or constitutional provisions outlawing or restricting the closed shop and related devices," laws "about which Congress seems to have been well informed during the 1947 debates … ." *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 86, 100 (1963) ("*Retail Clerks II*").

In relevant part, Section 8(a)(3) of the NLRA now reads:

> It shall be an unfair labor practice for an employer … by discrimination in regard to hire or tenure or employment or any term or condition of employment to encourage or discourage membership in any labor organization.

> *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not estab-

lished, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein … .

29 U.S.C. § 158(a)(3).

And Section 14(b) of the NLRA provides:

Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

29 U.S.C. § 164(b).

The Supreme Court has clarified the relationship between these two provisions: § 14(b) was intended to prevent other sections in the NLRA from "completely extinguishing state power over certain union-security arrangements." *Retail Clerks Intern. Ass'n, Local 1625 v. Schermerhorn*, 373 U.S. 746, 751 (1963) ("*Retail Clerks I*"). Specifically, "[Section 14(b)] was designed to make certain that § 8(a)(3) could not be said to authorize arrangements of this sort in States where such arrangements were contrary to the State policy." *Id.* (citations and internal quotation marks omitted). Thus, we read Section 14(b) as protecting states' authority to enact laws prohibiting union-security arrangements that are permissible under Section 8(a)(3) and other provisions of the NLRA. This reading was underscored by the Supreme Court's decision in *Retail Clerks II*, which declared that the legislative history "ma[de] clear and unambiguous the purpose of Con-

gress not to preempt the field." *Retail Clerks II*, 375 U.S. at 101. The Court concluded "that Congress in 1947 did not deprive the States of any and all power to enforce their laws restricting the execution and enforcement of union-security agreements" and that "it is plain that Congress left the States free to legislate" in the field of union-security agreements. *Id.* at 102. The freedom reserved to the states is extensive; "even if [a] union-security arrangement clears all federal hurdles, the States by reason of § 14(b) have the final say and may outlaw it." *Id.* at 102–03. The Supreme Court could not have been more explicit regarding the broad authority of states to prohibit union-security agreements.

It is against this backdrop of states' extensive authority, reserved to them by the language of the statute and the Supreme Court's interpretation, that we consider Plaintiff-Appellants' argument that provisions of the Indiana right-to-work legislation are preempted by federal labor legislation. Their primary argument is that Section 14(b) permits states to ban only union-security agreements "requiring membership," or else compelling workers to pay a full membership fee that serves as the functional equivalent of membership. The Indiana statute goes further by prohibiting unions from collecting any fees and dues from unwilling employees. The Plaintiff-Appellants assert that this ban is too strict because employees may still be required to pay a fee equal to their "fair share" of the collective bargaining costs—something less than the full membership fee—and not qualify as "members" of the union under Section 14(b). Section 8(a)(3), which permits such arrangements, would then, according to this argument, apply in full force and preempt any state statute barring the union's practice.

Plaintiff-Appellants further argue that such a reading is necessary because unions are required to act on behalf of all employees in labor disputes, and may not discriminate against non-members. To compel the union to represent all employees equally using dues contributed only by some workers, they argue, creates a free-rider problem. Indeed, the Supreme Court has observed that Section (8)(3) "was designed to remedy the inequities posed by 'free riders' who would otherwise unfairly profit from the Taft-Hartley Act's abolition of the closed shop." *Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 753–54 (1988).

We are not convinced that Section 8(3) preempts the Indiana statute, for several reasons.

### a. Interpretations of the Term "Membership" in the NLRA Context

Plaintiff-Appellants and the dissent admit that the Supreme Court has construed the term "membership" to have the same meaning in Sections 8(a)(3) and 14(b). Indeed, there is no reason to think that the term "membership" in Section 14(b) would mean something different from the term "membership" in Section 8(a)(3) of the same act. *See Sorenson v. Sec'y of Treasury of U.S.*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning.") (citation and quotation marks omitted). As a result, "the agreements requiring 'membership' in a labor union which are expressly permitted by the proviso are the same 'membership' agreements expressly placed within the reach of state law by § 14(b)." *Retail Clerks I*, 373 U.S. at 751. If membership for purposes of Section 8(a)(3) encompasses "an arrangement … requiring nonunion

members to pay to the union $2 a month 'for the support of the bargaining unit,'" *Gen. Motors*, 373 U.S. at 739, then membership under Section 14(b) should likewise extend to such fees.

The Supreme Court has described union membership as synonymous with paying the portion of dues germane to the union's collective bargaining. It has held that the term "membership" in Section 8(a)(3) has been "whittled down to its financial core." *Gen. Motors*, 373 U.S. at 742. And the Supreme Court has also made clear that this "financial core" of union membership extends to "only those fees and dues necessary to performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues."[3] *Beck*, 487 U.S. at 763 (citation and internal quotation marks omitted); *see also id.* at 745 ("The statutory question presented in this case … is whether this 'financial core' includes the obligation to support union activities beyond those germane to collective bargaining, contract administration, and grievance adjustment. We think it does not."). In other words, Representation Fees—those

---

[3] The dissent states that *Beck* should be read for the proposition that the term "membership" does not extend to those who pay only Representation Fees. (We define Representation Fees to be those fees germane to collective bargaining, contract administration, and grievance adjustment.) That contradicts *Beck*'s substantive holding. The Court held that § 8(a)(3) "authorizes the exaction of only" Representation Fees, an interpretation that necessarily requires that the term "membership" in that clause be read to mean Representation Fees. 487 U.S. at 762-63. It is true that in its statement of facts, *Beck* distinguishes between dues-paying employees "who choose not to be union members" and full dues-paying union members. *Id.* at 739. But that quirk is not substantive.

fees germane to collective bargaining, contract administration, and grievance adjustment—constitute the "financial core" of membership for the purposes of Section 8(a)(3) and for Section 14(b). Therefore, Section 14(b)'s express allowance of state laws prohibiting "agreements requiring *membership* in a labor organization as a condition of employment" necessarily permits state laws prohibiting agreements that require employees to pay Representation Fees (emphasis added).[4]

In the alternative, we find compelling the fact that the position advanced by the Union and adopted in the dissent necessarily entails reading § 8(a)(3) as making § 14(b) superfluous. As noted above, in *Beck* the Supreme Court stated that "§ 8(a)(3) … authorizes the exaction of only those fees and dues necessary to performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues." 487 U.S. at 762–63 (citation and internal quotation marks omitted); *see Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 38 (1998) ("§ 8(a)(3) does not permit unions to exact dues or fees from employees for activities that are not germane to collective bargaining, grievance adjustment, or contract administration."). In arguing that Representation Fees are permissible in all jurisdictions,

---

[4] As this analysis makes clear, our conclusion is compelled in part by *Beck*'s holding that the term "membership" extends to those who only pay Representation Fees, not simply by the *Retail Clerks* decisions. And we are bound by that precedent, even if the rule that the term "membership" has been "whittled down to its financial core" to include those who pay only Representation Fees does not fit with the ordinary meaning of the term "membership," as the dissent states.

including states that have promulgated right-to-work laws in accordance with § 14(b), the Union is asserting that all states must allow unions to negotiate the broadest, largest possible union-security arrangement permitted under § 8(a)(3). That can't be right.

Both of these points are more compelling than the alternative readings of "membership" presented to us by the Plaintiff-Appellants, who hang their interpretation on several slender branches: two contemporaneous dictionary definitions, and a federal statutory definition found in a different statute passed twelve years after the Taft-Hartley Act. *See* The Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq*. Not only are both of these sources extraneous to the statute we are charged to interpret in this case, but they also cannot alter the Supreme Court's later construction of the term "membership" in the *Retail Clerks* cases and *Beck.*

### b. State Statutory Schemes Concurrent with Taft-Hartley

Also compelling are the state right-to-work laws in effect at the time of the Taft-Hartley Act's passage in 1947. As the Supreme Court stated in *Retail Clerks II*, twelve states had right-to-work laws in effect when Taft-Hartley was enacted: Arizona, Arkansas, Georgia, Iowa, Nebraska, Nevada, North Carolina, North Dakota, South Dakota, Tennessee, Texas and Virginia.[5] These laws fell into two different categories. The

---

[5] State Laws Regulating Union-Security Contracts," 21 L.R.R.M. 66 (1948). Of these states, ten states retain the same right-to-work statutory language to the present day. The two exceptions are Nevada and Texas.

Continued on next page

first broadly disallowed compulsory union membership. The second included specific provisions outlawing compulsory payment of dues or fees to labor organizations. An example of a statute from the second group is Iowa's right-to-work law, which was enacted on April 28, 1947, two months before the passage of the Taft-Hartley Act:

> **Sec. 1**. It is declared to be the policy of the State of Iowa that no person within its boundaries shall be deprived of the right to work at his chosen occupation for any employer because of membership in, affiliation with, withdrawal or expulsion from, or refusal to join, any labor union, organization, or association, and any contract which contravenes this policy is illegal and void.
>
> […]
>
> **Sec. 4**. It shall be unlawful for any person, firm, association, labor organization or corporation, or political subdivision, either directly or indirectly, or in any manner or by means as a pre-

---

In the case of Nevada, there was a right-to-work provision in effect from 1911 to 1951 in the Crimes and Punishment Act of 1911, which remained in effect until 1951. After a two-year hiatus, a formal, standalone right-to-work law was added in 1953 through initiative petition. Nevada Legislative Counsel Bureau Office of Research Background Paper No. 75-08 (1975). In Texas, a right-to-work law was passed in 1947 and styled Texas Civ. Code § 5207a. It seems to have been updated and re-numbered to appear at Texas Lab. Code § 101 in 1993. The 1993 amendment gave rise to Texas's specific language that restricted compelled payment of dues and fees to unions.

> requisite to or condition of employment to re-
> quire any person to pay dues, charges, fees,
> contributions, fines or assessments to any labor
> union, labor association or labor organization.

IOWA CODE § 736A.1, 4 (1947), renumbered as IOWA CODE § 731.1, 4 (1977).

All told, of the twelve state right-to-work statutes in effect in 1947, more than half –seven – included language similar to Indiana's and Iowa's statutes. ARK. CODE ANN. § 11-3-303 (1947); GA. CODE ANN. § 34-6-22 (1947); IOWA CODE § 731.4 (enacted 1947, renumbered 1977); NEB. REV. STAT. § 48-217 (1947); N.C. GEN. STAT. § 95-82 (1947); TENN. CODE ANN. § 50-1-203 (1947); VA. CODE ANN. § 40.1-62 (enacted 1947, renumbered 1970). Congress was well aware of these statutes when it drafted Section 14(b). *See* H.R. Rep. No.245, 80th Cong., 1st Sess. 34, reprinted in I *Legislative History of the Labor Management Relations Act of 1947* 324 (1948) (listing states with such statutes). As discussed above, the stated purpose of Section 14(b) was to preserve the efficacy of laws like these – statutes that allowed states to place restrictions of their choosing on union-security agreements, including restrictions on whether employees could be compelled to pay dues or fees of any kind to a union.[6]

---

[6] The legislative history demonstrates that Congress drafted Section 14(b) to preserve the right-to-work statutes already in effect in 1947. *See Int'l Union of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus., Local Unions Nos. 141, 229, 681, & 706 v. NLRB*, 675 F.2d 1257, 1273 (D.C. Cir. 1982) (Mikva, J., dissenting) ("The best evidence of congressional intent may therefore lie in the kinds of 'compulsory unionism' that members of Congress understood had been banned

Continued on next page

Presently, twenty-four states have some form of a right-to-work law.[7] The overwhelming majority of jurisdictions—eighteen, by our count, including Guam—have adopted language substantially identical to the prohibition in Ind. Code § 22-6-8(2). *See* ALA. CODE § 25-7-34 (1953); ARK. CODE ANN. § 11-3-303 (1947); GA. CODE ANN. § 34-6-22 (1947); IDAHO CODE ANN. § 44-2003(3) (1985); 22 GUAM CODE ANN. § 4103(3) (2000); IOWA CODE § 731.4 (transferred 1977); LA. REV. STAT. ANN. § 23:983 (1976); MICH. COMP. LAWS § 423.17 (2013); MISS. CONST. art. 7, § 198-A (1960); NEB. REV. STAT. § 48-217 (1947); N.C. GEN. STAT. § 95-82 (1947); OKLA. CONST. art. 23, § 1A (2001); S.C. CODE ANN. § 41-7-30 (1954); TENN. CODE ANN. § 50-1-203 (1947); TEX. LAB. CODE ANN. § 101.004 (1993); UTAH CODE ANN. § 34-34-10 (1955); VA. CODE ANN. § 40.1-62 (1947); WYO. STAT. ANN. § 27-7-111 (1963); *see also* N.D. CENT. CODE § 34-01-14.1 (1987), *repealed by NLRB v. North Dakota*, 504 F. Supp. 2d 750 (D.N.D. 2007). The longevity of many of these statutes, coupled with the lack of disapproval expressed by the Supreme Court, suggests to us that Indiana's right-to-work law falls squarely within the realm of acceptable law.

We also find persuasive a decision by the D.C. Circuit, the only decision from a sister circuit to squarely address the

by the state right-to-work laws."). Yet the dissent's position necessarily entails concluding that Congress did not intend § 14(b)'s protections to extend to the *majority* of right-to-work statutes then in effect. That is not a reasonable interpretation of legislative history.

[7] National Conference of State Legislatures, "Right-to-Work Resources," available at http://www.ncsl.org/research/labor-and-employment/right-to-work-laws-and-bills.aspx (last accessed Aug. 20, 2014).

question before us.[8] Faced with the question of whether a union could assess non-union employees for Representation Fees in four right-to-work states, the D.C. Circuit found, on the basis of the legislative history of the Taft-Hartley Act, that the assessment of such fees constituted an unfair labor practice. *Journeymen & Apprentices*, 675 F.2d at 1260–62. The D.C. Circuit held that "Congress knew precisely what state laws it was validating when it passed § 14(b)" as "[t]he House Report listed each state which had passed a right-to-work law or constitutional provision." *Id.* at 1260. Specifically, the D.C. Circuit was persuaded that "Congress also knew about the free rider problem posed by such laws when it sanctioned such laws by passing § 14(b)," as shown by a comment in the Senate Committee report on the bill reflect-

---

[8] The dissent cites two circuit decisions that stand for the principle that § 14(b) does not authorize states to prohibit the use of exclusive hiring halls that do not discriminate between union members and non-members. *See Laborers' Int'l Union of N. Am., Local No. 107 v. Kunco, Inc.*, 472 F.2d 456 (8th Cir. 1973); *NLRB v. Houston Chapter, Associated Gen. Contractors of Am., Inc.*, 349 F.2d 449 (5th Cir. 1965). Both decisions precede *Beck* and did not have the benefit of the Court's interpretation of "membership" in that case. And the D.C. Circuit, in *Journeymen & Apprentices*, found both cases "clearly distinguishable" from the matter at hand on the basis that these concern pre-hiring practices, whereas § 14(b) applies to post-hiring union security arrangements. *Journeymen & Apprentices*, 675 F.3d at 1262, 1267 ("Use of a union hiring hall precedes hiring and therefore does not constitute 'membership' under § 14(b)."). We agree that these cases are distinguishable because hiring halls do not require prospective employees to do anything more than temporarily visit union facilities during the hiring process. Such temporary affiliation does not amount to "membership" as that term has been interpreted by the Supreme Court.

ing unions' concerns about free riders,[9] as well as Senator Taft's rebuttal on that point that "[m]any states have enacted laws or adopted constitutional provisions to make all forms of compulsory unionism in such states illegal. As stated in the report accompanying the Senate committee bill, it was not the intent to deprive the States of such power." *Id.* at 1260–61 (citation omitted). And the D.C. Circuit noted that this problem was so well known that President Truman criticized it in his veto message. *Id.* at 1261.

Plaintiff-Appellants are right that Congress was concerned that banning the closed shop would create a free-rider problem, but only in those states that had no additional restriction on union-security agreements. *Id.* at 1260 ("[L]eaders of organized labor have stressed the fact that in

---

[9] "A controversial issue to which the committee has devoted the most mature deliberation has been the problem posed by compulsory union membership … . [A]buses of compulsory membership have become so numerous there has been great public feeling against such arrangements. This has been reflected by the fact that in 12 States such agreements have been made illegal either by legislative act or constitutional amendment, and in 14 other States proposals for abolishing such contracts are now pending. Although these regulatory measures have not received authoritative interpretation by the Supreme Court (citation omitted) it is obvious that they pose important questions of accommodating Federal and State legislation touching labor relations in industries affecting commerce (citations omitted). In testifying before this committee, however, leaders of organized labor have stressed the fact that in the absence of such provisions many employees sharing the benefits of what unions are able to accomplish by collective bargaining will refuse to pay their share of the cost." *Journeymen & Apprentices*, 675 F.2d at 1260 (citing Report of the Senate Committee on Labor and Public Welfare presented by Senator Taft, 80th Cong., 1st Sess. 6, April 17, 1947).

the absence of [anti-union-security] provisions many em-
ployees sharing the benefits of what unions are able to ac-
complish by collective bargaining will refuse to pay their
share of the cost.") (quoting the Report of the Senate Com-
mittee on Labor and Public Welfare presented by Senator
Taft, 80th Cong., 1st Sess. 6, April 17, 1947). On the other
hand, Congress explicitly permitted states that did restrict
those agreements to find their own solution to the free-rider
problem, if it was a problem in those states. Indeed, unions
continue to thrive and assert significant influence in several
right-to-work states, including Iowa,[10] where provisions
equivalent to Indiana's have been in effect for more than six-
ty-five years. If the Plaintiff-Appellants believe that Indi-
ana's law will create a new or unexpectedly severe free-rider
problem, they may address those concerns to Congress.

In sum, in reviewing this substantial body of empirical
evidence, we are not persuaded by Plaintiff-Appellants'
claims that Indiana's law is somehow an extraordinary
measure distinct from the numerous state statutes that have
harmoniously existed under the federal labor law frame-
work. Nor are we persuaded by their assertions that Indi-
ana's law represents a mortal threat to the continuing exist-
ence of unions as provided under federal law. Section 8(2) of

---

[10] *See, e.g.*, Kris Maher, "Iowa's House of Labor is Split," WALL ST. J.
(Nov. 20, 2007) at A6 (examining the importance of "big, politically ac-
tive unions" in the Iowa caucus vote); Steven Greenhouse, "Secret
Weapon in Gore Camp: Unions in Iowa," N.Y. TIMES (Jan. 17, 2000) at
A14, available at http://www.nytimes.com/2000/01/17/us/the-2000-
campaign-the-unions-secret-weapon-in-gore-camp-unions-in-iowa.html
(calling Iowa's 150,000-member union force a major "weapon" in the
Iowa caucuses) (last accessed Aug. 20, 2014).

the Indiana right-to-work statute is thus not preempted by the NLRA.

### c.  Plaintiff-Appellants' Miscellaneous Preemption Arguments

Plaintiff-Appellants assert two other preemption arguments. Both deserve only quick consideration.

The first assertion, that federal labor law preempts the Indiana law's criminal penalties, clashes squarely with language in *Retail Clerks II,* where the Supreme Court stated that

> In light of the wording of § 14(b) and this legislative history, we conclude that Congress in 1947 did not deprive the States of any and all power to enforce their laws restricting the execution and enforcement of union-security agreements. Since it is plain that Congress left the States free to legislate in that field, we can only assume that it intended to leave unaffected the power to enforce those laws.

*Retail Clerks II,* 375 U.S. at 102.

The Union's second argument is that the NLRA preempts § 8(3) of the statute, which bars mandatory payments of an amount equivalent to union dues to a charity. They rely on § 19 of the NLRA, which allows conscientious objectors to pay dues to a charity rather than to a union. But the applicability of that section naturally presupposes the existence of a union-security agreement that requires the payment of dues. And as we have demonstrated, states are permitted to restrict or prohibit such agreements. We agree with the district court's assessment that "[n]othing in the language of § 19

suggests or supports interpreting it as an exemption to § 14(b) that would preempt any state attempt to outlaw the kind of provision that § 19 permits." *Sweeney v. Daniels*, 2013 WL 209047, *11 (N.D. Ind. Jan. 17, 2013).

### 2. Federal Constitutional Claims

The dissent claims that our interpretation of the federal statutory schema works an unconstitutional taking on Hoosier unions. We consider this argument first. Plaintiff-Appellants also allege violations of the Contracts, *Ex Post Facto,* and Equal Protection Clauses of the United States Constitution. Because both their Contracts and *Ex Post Facto* Clause arguments have force only if the statute applies retroactively, we consider them together.

### a. Indiana's Law Does Not Work an Unconstitutional Taking

The dissent asserts that, should we hold that the federal statutory scheme does not preempt Indiana's right-to-work statute, that holding likely violates the Takings Clause of the Fifth Amendment, as applied to the states under the Fourteenth Amendment. Dissent at 17–18. We observe that no argument based on the Takings Clause was advanced by the Union, and so any such argument was forfeited. *See Jackson v. Parker*, 627 F.3d 634, 640 (7th Cir. 2010) (noting that arguments not raised before the district court are forfeited); *Trs. of Chi. Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 790 (7th Cir. 2007) (noting that arguments not raised in the opening brief are forfeited). And there is the problem of whether the Union has sued the proper defendants for the purposes of advancing a claim

under the Takings Clause. The Union's alleged deprivation is the product of federal law and the Indiana statute operating in tandem. Because it is *federal* law that provides a duty of fair representation, Indiana's right-to-work statute does not "take" property from the Union – it merely precludes the Union from collecting fees designed to cover the costs of performing the duty. Even supposing the Union could justify its suit by invoking something like the tort doctrine of "concurrent actual causes,"[11] the dissent has not explained why the proper remedy would be to strike down Indiana's right-to-work statute rather than striking down or modifying the federal law imposing on all unions the duty of fair representation, in right-to-work states and non-right-to-work states alike.

Even so, we engage with the dissent's position because we believe it overlooks the fundamental fact that distinguishes the union's duty of representation from the other hypotheticals it presents. That is to say: we believe the union is justly compensated by federal law's grant to the Union the right to bargain exclusively with the employer. The reason the Union must represent all employees is that the Union alone gets a seat at the negotiation table. *See Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 761 (1961) (A "union's status as exclusive bargaining representative carries with it the duty fairly and equitably to represent all employees of the

---

[11] *See Hill v. Edmonds*, 26 A.D.2d 554, 554–55 (N.Y. App. Div. 1966) ("Where separate acts of negligence combine to produce directly a single injury each tort-feasor is responsible for the entire result, even though his act alone might not have caused it … .").

craft or class, union and nonunion."); *Hughes Tool Co.*, 104 N.L.R.B. 318, 324–25 (1943) ("[A] union could not assess nonmembers for costs arising from contract negotiations for the latter are the exclusive duty and prerogative of the certified representative which the nonmember minority is both entitled to and bound under."). The powers of the bargaining representative are "comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents." *Steele v. Louisville & N.R. Co.*, 65 S. Ct. 226, 232 (1944). The duty of fair representation is therefore a "corresponding duty" imposed in exchange for the powers granted to the Union as an exclusive representative. *Id.* It seems disingenuous not to recognize that the Union's position as a sole representative comes with a set of powers and benefits as well as responsibilities and duties. And no information before us persuades us that the Union is not fully and adequately compensated by its rights as the sole and exclusive member at the negotiating table.

### b. Contracts and *Ex Post Facto* Clause Arguments

The Contracts Clause provides that "[n]o State shall … pass any … law impairing the Obligation of Contracts." U.S. CONST. art. I, § 10, cl. 1. A state violates the Contracts Clause when a "change in state law has operated as a substantial impairment of a contractual relationship." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) (citation and internal quotation marks omitted). The relevant inquiry has three components: 1) whether there is a contractual relationship; 2) whether a change in law impairs that contractual relationship; and 3) whether the impairment is substantial. *Council 31 of the Am. Fed'n of State, Cnty., & Mun. Emps. v. Quinn*, 680 F.3d 875, 885 (7th Cir. 2012) (citing *Khan v. Gallitano,* 180 F.3d

829, 832 (7th Cir. 1999)). The *Ex Post Facto* Clause is violated by state or federal legislation that "makes an act done before the passing of the law, and which was innocent when done, criminal, and punishes such action." *Peugh v. United States*, 133 S. Ct. 2072, 2081 (2013) (citation and internal quotation marks omitted). The parties agree that for the Indiana law to violate these clauses of the Constitution, the law must have some retroactive application: it must either impair an already existing contract or else punish past conduct. We find that the law does not apply retroactively.

This conclusion is relatively easy to reach because Section 13 of the Indiana statute provides that the substantive provisions of the legislation—Sections 8 through 12—apply only to contracts entered into after March 14, 2012, and "do not apply to or abrogate a written or oral contract or agreement in effect on March 14, 2012." IND. CODE § 22-6-6-13. The main objection Plaintiff-Appellants make here is to Section 3 of the statute. They argue that Section 3 is a substantive provision not mentioned in Section 13, and that it thus has retroactive application.

In interpreting the language of a statute, we "must examine the language and design of the statute as a whole." *Wells Fargo Bank, Nat'l Ass'n v. Lake of Torches Econ. Dev. Corp.*, 658 F.3d 684, 694 (7th Cir. 2011) (citations and internal quotation marks omitted). And we must also keep in mind "[t]he presumption against retroactive legislation," which "embodies a legal doctrine centuries older than our Republic." *Vartelas v. Holder*, 132 S. Ct. 1479, 1486 (2012) (citation and internal quotation marks omitted). We are inclined to agree that Section 3 is an oddly drafted provision. It resides in a neighborhood of prefatory clauses, nestled amid definitions of key

terms and exceptions, but its sub-sections appear surprisingly substantive: indeed, Section 3's sub-provisions are identical in content to the sub-sections of Section 8. However, Section 3's main clause is drafted in the language of exception. It explains that the statute should not be read to change the laws of the building and construction industry, an industry that has its own set of elaborate labor laws, except to prohibit agreements of the type banned by Section 8. It is a double negative—no change except the following changes—that would be more comprehensible if drafted in the positive, but the placement of the clause makes sense among the other prefatory, exclusionary clauses like Sections 1 ("This chapter does not apply to the following: … .") and 2 ("This chapter does not apply to the extent that … ."). IND. CODE §§ 22-6-6-1, 2. In light of the design of the statute as a whole, we are satisfied that the provision in question is prefatory, not substantive. It simply explains the domains to which the substantive portions of the statute apply. To the extent that Section 3 contains substantive language, it is language that simply points to the later substantive sections outlawing union-security clauses. This reading best harmonizes the structure of the statute and the presumption against retroactive legislation.[12]

---

[12] In support of our reading, Defendant-Appellees assert the fact that the Indiana Commissioner of Labor has disclaimed any retroactive interpretation of Section 3, but this is not persuasive. While the district court was satisfied by the Commissioner's declaration, terming it binding under the principles of judicial estoppel, it is difficult to determine what effect such declarations would have on future executive administrations or office-holders. But our reading of the statute convinces us that Section 3 is not retroactive, so we need not rely on the concept of estoppel.

### c. Equal Protection Clause Arguments

The Equal Protection Clause of the Fourteenth Amendment states that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. Equal protection scrutiny is triggered "when a regulation draws distinctions among people based on a person's membership in a 'suspect' class" or based on "a denial of a fundamental right." *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009) (citations omitted). If either a suspect class or fundamental right is implicated, "the government's justification for the regulation must satisfy the strict scrutiny test to pass muster under the Equal Protection Clause." *Id.* But if neither condition is present, the proper standard of review is rational basis. *Id.*

Plaintiff-Appellants argue that the Indiana Right to Work Act violates the Equal Protection Clause in two ways: (1) because it allows free riders to infringe on union members' First Amendment free speech rights, and (2) because it allows free riders to infringe on the right of union membership, which is a fundamental right because it involves the exercise of First Amendment association and assembly rights. We hold that the law does not violate the equal protection clause because it does not implicate a fundamental right, and it passes the low bar of rational basis review with ease.

### i. First Amendment Free Speech Rights

The stronger of Plaintiff-Appellants' two equal protection arguments is the assertion that non-payors of Representation Fees will be free-riders who siphon valuable Union resources away from the Union's political activities. In dimin-

ishing the financial resources available to the Union for po-
litical speech, Plaintiff-Appellants argue, the Indiana law in-
fringes on the Union's First Amendment free speech rights.
We agree that unions have "the right under the First
Amendment to express their views on political and social
issues without government interference." *Knox v. Serv.
Empls. Int'l Union, Local 1000,* 132 S. Ct. 2277, 2295 (2012).

However, Plaintiff-Appellants' argument is undercut by
three long-standing principles. First, the Supreme Court has
stated that "unions have no constitutional entitlement to the
fees of non-member employees." *Davenport v. Wash. Educ.
Ass'n*, 551 U.S. 177, 185 (2007). And more relevantly, the First
Amendment "protects the right to be free from government
abridgement of speech," but it does not "require[]" the gov-
ernment "to assist others in funding the expression of par-
ticular ideas, including political ones." *Ysursa v. Pocatello
Educ. Ass'n*, 555 U.S. 353, 358 (2009). Stated another way,
"although government may not place obstacles in the path of
a person's exercise of freedom of speech, it need not remove
those not of its own creation." *Regan v. Taxation With Repre-
sentation of Wash.*, 461 U.S. 540, 549–50 (1983) (internal quota-
tion marks and citations omitted). It may be true that the Un-
ion "does not have money as it wants, and thus cannot exer-
cise its freedom as it would like," but "the Constitution does
not confer an entitlement to such funds as may be necessary
to realize all the advantages of that freedom." *Id.* at 550 (in-
ternal quotation marks and citations omitted). "A legisla-
ture's decision not to subsidize the exercise of a fundamental
right does not infringe the right, and is thus not subject to
strict scrutiny." *Ysursa*, 555 U.S. at 358 (internal quotation
marks and citations omitted).

The Union does not assert that the Indiana state legislature has taken away an asset to which the Union was constitutionally entitled. Viewed in the best possible light, its argument is that Indiana has made it more difficult for the Union to collect as many funds as it is used to collecting. But Indiana, like the state of Idaho in *Ysursa*, is "under no obligation to aid the unions in their political activities. And the State's decision not to do so is not an abridgement of the unions' speech; they are free to engage in such speech as they see fit." *Id.* at 359.

Lastly, as underscored a recent case concerning whether non-union public employees could be compelled to pay agency fees to a state-designated union, the Supreme Court has held that there is a competing First Amendment interest at play with free-rider arguments of this variety: "the First Amendment interests of those … who do not wish to support the union." *Harris v. Quinn*, 134 S. Ct. 2618, 2643 (2014). It reaffirmed that "[a]gency-fee provisions unquestionably impose a heavy burden on the First Amendment interests of objecting employees." *Id.* And "free-rider arguments … are generally insufficient to overcome First Amendment objections." *Id.* at 2657.

In passing its right-to-work legislation, Indiana did not abridge the Union's speech, and thus did not violate its First Amendment right to free speech. Rational basis review is proper for this equal protection claim.

### ii.      Fundamental Right of Union Membership

Appellants' weaker argument is the assertion that there exists a fundamental right of union membership. "Collective bargaining is not a fundamental right," and a union and its

members "are not suspect classes." *Univ. Prof'ls of Ill., Local 4100 v. Edgar*, 114 F.3d 665, 667 (7th Cir. 1997); *see also City of Charlotte v. Local 660, Int'l Ass'n of Firefighters*, 426 U.S. 283, 286 (1976) ("[T]his court would reject such a contention if it were made that respondents' status as union members … is such as to entitle them to special treatment under the Equal Protection Clause … ."). Since we agree with the Tenth Circuit's assertion that "neither union nor non-union status implicates a fundamental right or constitutes a protected class," *Local 514 v. Keating*, 358 F.3d 743, 754 (10th Cir. 2004), we opt for rational basis review unless Plaintiff-Appellants can assert a cognizable fundamental right that has been violated by the Indiana statute.

Plaintiff-Appellants claim that they never asserted that union members are a suspect class. Instead, they try to cobble a brand new fundamental right to union membership out of the fact that union membership implicates the First Amendment rights of freedom of assembly and freedom of association. But besides being intellectually threadbare—consider, for example, that these same facts could be marshalled to support a fundamental right to Civil War reenactment—this line of reasoning was rejected by the Supreme Court long ago. Union members in North Carolina and Nebraska made the same argument when they challenged the two states' right-to-work laws in the late 1940s. They asserted, *inter alia*, that their freedom of association and assembly was infringed. In *Lincoln Federal Labor Union No. 19129, v. Northwestern Iron & Metal Co.*, the Supreme Court stated:

> There cannot be wrung from a constitutional
> right of workers to assemble to discuss im-
> provement of their own working standards, a

further constitutional right to drive from re-
munerative employment all other persons who
will not or can not, participate in union assem-
blies. The constitutional right of workers to as-
semble, to discuss and formulate plans for fur-
thering their own self interest in jobs cannot be
construed as a constitutional guarantee that
none shall get and hold jobs except those who
will join in the assembly or will agree to abide
by the assembly's plans. For where conduct af-
fects the interests of other individuals and the
general public, the legality of that conduct
must be measured by whether the conduct
conforms to valid law, even though the con-
duct is engaged in pursuant to plans of an as-
sembly.

335 U.S. 525, 531 (1949).

There is no doubt that union workers enjoy valuable
rights of association and assembly that are protected by the
First Amendment. *See, e.g.*, *Thomas v. Collins*, 323 U.S. 516
(1945). But as in *Lincoln Federal*, that right alone cannot oper-
ate as an offensive weapon to wrest rights from others: here,
the Hoosier workers whose rights not to associate with the
union are protected by the new legislation. *See, e.g., Harris*,
134 S. Ct. at 2643 (noting the "First Amendment interests of
those … who do not wish to support the union"); *Knox*, 132
S. Ct. at 2289 (holding that compelled membership in a pub-
lic-sector union, which takes positions during collective bar-
gaining that can have powerful civic and political conse-
quences, can "constitute a form of compelled speech and as-
sociation that imposes a significant impingement on First

Amendment rights" (citation and internal quotation marks omitted)). Plaintiff-Appellants must thus make a greater showing: a clear basis for how the laws will "expressly forbid the full exercise of those rights by union or union members," *Lincoln Federal*, 335 U.S. at 530, or even a plausible demonstration of how allowing non-union workers to not pay Representation Fees will somehow weaken the bonds of the union's own association and assembly. They have failed to do so here. Rational basis review is appropriate for this equal protection claim as well.

### iii. The Statute Passes Rational Basis Review

Statutes that do not encroach on a fundamental right are reviewed with "considerable deference." *See United States v. Moore*, 644 F.3d 533, 555 (7th Cir. 2011). The pertinent inquiry is whether the statute in question "bears a reasonable relation to any proper legislative purpose." *Id.* at 555–56. It is not our task to discern the specific intent of the legislature, but to determine if any proper legislative purpose is served by Indiana's law.

The district court's analysis on this point is apt. As the court stated, "[a] belief that the passage of Right to Work legislation contributes to a business-friendly environment that can attract companies and encourage job growth provides a legitimate governmental objective that may have been (and was in fact claimed to be) a reason for the passage of Indiana's Right to Work legislation." *Sweeney*, 2013 WL 209047 at *8. We need look no further for a rational basis. The Indiana law does not violate the Plaintiff-Appellants' right to equal protection.

## III

We noted at the outset that this legislation prompted vigorous debate, both in the general public and the Indiana Statehouse. But the legislative history and context of the Taft-Hartley Act make clear that the controversy is one that ought to be addressed and resolved at the level of legislative politics, not in the courts. The statutory question posed is whether Indiana's new law is preempted by federal labor law, or threatens the Union's First Amendment rights. The answer is an emphatic no. Right-to-Work laws like Indiana's have existed since before the passage of the Taft-Hartley Act and the inclusion of Section 14(b) of the NLRA. Congress specifically reserved to the states the power to write and enforce laws of this nature, in accordance with individual states' needs and wisdom. It is not our province to wrest this authority, which has been intact and undisturbed for over sixty-five years, from the states and erase the distinction between right-to-work states and non-right-to-work states.

For the foregoing reasons, we AFFIRM the district court's judgment.

WOOD, *Chief Judge*, dissenting. Today's decision is either incorrect or it lays bare an unconstitutional confiscation perpetuated by our current system of labor law. In my view, the better view is the former: the majority has simply misunderstood the federal statutory scheme, taken as a whole. The plain language of section 14(b) of the National Labor Relations Act (NLRA) does not support such sweeping force for Indiana's Right to Work law. IND. CODE § 22-6-6. No ruling of the Supreme Court has gone this far, and the legislative history of section 14(b) (for those who consider it relevant at all) is inconclusive. Even if, however, one thought that there were some ambiguity in the NLRA, the principle of constitutional avoidance provides a powerful reason to reject the majority's holding. I would find sections 8(2) and 8(3) of Indiana's statute, Ind. Code § 22-6-6-8(2), (3), preempted by federal statute. I therefore respectfully dissent.

## I

It is impossible to understand what is at stake and why the majority's resolution is in error without a brief review of the labor law regime in the United States. Inaugurated in 1935 with the passage of the Wagner Act, 49 Stat. 452, the NLRA relies on a system of exclusive representation of bargaining-unit employees. See 29 U.S.C. § 159(a). That is, if a majority of the employees in a defined section of a workforce vote in favor of a particular union to represent them, that union is required by law to represent all the workers in the bargaining unit—supporters and nonsupporters, members and nonmembers, alike. *Id.*; see *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 760–61 (1961) ("a union's status as exclusive bargaining representative carries with it the duty fairly and equitably to represent all employees of the craft or class,

union and nonunion"). (This is hardly an unfamiliar arrangement in a democracy. Even after the most hotly contested presidential election, the person who is declared the winner becomes the President for all citizens, not just those who voted for him or her.) There is nothing inevitable about our system of labor law; it can be contrasted with a hypothetical regime that is more protective of minority or members-only unions, under which employees who want to bargain collectively might be free to form a members-only union and interact with their employer on that basis. But, to repeat, that is not the system that the United States has adopted.

Consequences flow from the union's status as the exclusive representative of all members of the bargaining unit. The most significant is what is known as the duty of fair representation. See *Steele v. Louisville & N.R. Co.*, 323 U.S. 192 (1944) (recognizing the duty of fair representation under the Railway Labor Act); *Ford Motor Co. v. Huffman*, 345 U.S. 330, 337–38 (1953) (extending duty of fair representation to the National Labor Relations Act). The duty of fair representation requires the exclusive bargaining representative (*i.e.*, the union) to "serve the interests of all members [of the bargaining unit] without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). This duty is not limited to the negotiation process; it covers all union representational activity. See *id.* at 190–91 (duty of fair representation extends to grievance and arbitration); *Air Line Pilots Ass'n, Int'l. v. O'Neil*, 499 U.S. 65, 67 (1991) ("We hold that the rule announced in *Vaca* … applies to all union activity … ."). The Supreme Court's opin-

ion in *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209 (1977), sum-
marized the scope of those duties well:

> The designation of a union as exclusive representative
> carries with it great responsibilities. The tasks of ne-
> gotiating and administering a collective-bargaining
> agreement and representing the interests of employ-
> ees in settling disputes and processing grievances are
> continuing and difficult ones. They often entail ex-
> penditure of much time and money. … The services
> of lawyers, expert negotiators, economists, and a re-
> search staff, as well as general administrative person-
> nel, may be required. Moreover, in carrying out these
> duties, the union is obliged fairly and equitably to
> represent all employees …, union and nonunion,
> within the relevant unit.

*Id.* at 221 (internal citation and quotation marks omitted).

As this passage acknowledges, a major part of the work
assigned to most unions under collective bargaining agree-
ments relates to the administration of the grievance proce-
dure. Grieving and arbitrating claims is not cheap. The web-
site of the Teamsters union informs its members that 78% of
their dues "stay with your local union" for a variety of pur-
poses, including the retention of "[a]ttorneys to assist in ne-
gotiations, grievances, and arbitration." See
http://teamster.org/about/frequently-asked-questions-
faq#faq06 (this and all other websites cited in this opinion
were last visited August 29, 2014). The Labor Arbitration
Rules of the American Arbitration Association, available by
following the links in the Rules & Procedures tab at
http://www.adr.org, outline a comprehensive process that
obviously costs real money. It is no stretch to estimate that

the cost of pursuing many grievances from initial investigation through arbitration can reach into the thousands of dollars, representing the time of the affected employee and his union representative, witness and travel costs, arbitrator fees, and the cost of outside legal counsel. The duty of fair representation requires the union to absorb these costs whether or not the aggrieved employee is a union member.

Note the significant asymmetry embedded in this system. While the union is required to represent all persons in the bargaining unit fairly and equally, each one of these people is entitled to decide whether to become a member of the union. Those who opt to become members will pay their union dues, which cover both activities such as collective bargaining, contract administration, and grievances (to which I refer as representational activities) and a variety of ancillary political or ideological activities (to which I refer as ancillary activities). But what of those who choose not to become members? It has been established for years that they may not be compelled to pay for the ancillary activities, no matter what the label placed on that payment. See *Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 738 (1988). So any question of compelling support for speech with which the nonmember disagrees is off the table.

Until now, however, reimbursement for the benefits that the union *must* confer on the nonmember has been a different matter, and for good reason. If there is no way to compel the nonmember employee to pay the actual cost of the services the union is obligated to provide for him, a classic "free-rider" problem arises. Free-riding is a potential problem whenever a collective good (such as the union services here) is involved. If the good (or service) can be priced indi-

vidually (that is, the seller can ensure that only the buyer ob-
tains the benefit), free-riding will not be a problem. But if
each person in the group obtains the benefit of the collective
good whether or not she pays for it, then there is a risk that
the supply of the good will diminish, or in the limiting case
will disappear altogether. See generally Earl R. Burbaker,
*Free Ride, Free Revelation, or Golden Rule?* 18 J.L. & ECON. 147,
149–150 (1975); Russell B. Korobkin & Thomas S. Ulen, *Law
and Behavioral Science: Removing the Rationality Exception from
Law and Economics*, 88 CALIF. L. REV. 1051, 1139 (2000). Thus,
for example, the realization of the risk of free-riding by dis-
tributors who did not want to provide services that manu-
facturers valued led antitrust law to change from a *per se*
prohibition of vertical restraints to a rule-of-reason ap-
proach. See *Cont'l T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36
(1977); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551
U.S. 877 (2007). In our situation, the nonmember of the union
will reap the benefits of being represented by the union dur-
ing a grievance, for instance, but he will pay nothing for
those benefits, which might include a lay representative,
maybe even a lawyer, investigative services, and so on—all
things that cost the union real dollars to provide. In short, he
will take a "free ride" on the dues that the union members
make to the union.

The same problem arises in a unionized workplace (that
is, a workplace in which a majority of the employees have
voted to have a union represent them, in an election super-
vised by the National Labor Relations Board, or NLRB). Be-
cause all members of the bargaining unit benefit as a matter
of right from the union's representational activities regard-
less of whether they join the union, there is an incentive for
employees in the bargaining unit "to refuse to contribute to

the union while obtaining benefits of union representation that necessarily accrue to all employees." *Abood*, 431 U.S. at 222. The benefits in this case, as in most, extend well beyond the boost from union speech that the Supreme Court found inadequate to support a rule requiring nonmember fair share contributions in *Harris v. Quinn,* 134 S. Ct. 2618, 2636–37 (2014). I discuss *Harris* in more detail below.

The question is therefore whether the law as it stands today includes a solution to the potential free-rider problem. If it does, by creating a way to require nonmembers to pay for actual benefits received, then all is well. If it does not, then issues of constitutional magnitude arise. As the Supreme Court has recognized, "[t]o compel employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests." *Id.* But to exempt employees from reimbursing a service provider for work performed creates a different constitutional issue—one that the Supreme Court has had little to no occasion to discuss. But we can glean something from *Phillips v. Washington Legal Foundation,* 524 U.S. 156 (1998), which addressed the question whether interest income generated by funds in lawyers' trust accounts (IOLTA) was the private property of the client. The Court held that it was. That holding raised the question whether clients could be compelled to donate their property to a foundation that provided legal services to the indigent. In *Brown v. Legal Foundation of Washington,* 538 U.S. 216 (2003), the Court held that if the state wished to require the client's property to be transferred from the IOLTA account to the foundation, its action had to be judged under the Takings Clause of the Fifth Amendment. It held that the clients' property had been taken for a public use when it was

turned over, see 538 U.S. at 235, but that no compensation was due, because the petitioners' net loss was zero. *Id.* at 240.

The lesson from the IOLTA cases for us is that a state law compelling one private party to give property to another private party must be assessed under the Takings Clause. The fact that those two cases involved money, while our case involves the compulsory provision of services, is of no moment. (This, incidentally, shows why the plaintiffs have sued the correct party: it is the Indiana law that is compelling them to donate valuable services to the nonmembers of the unions, just as it was state law in *Phillips* and *Brown* that compelled clients to donate their money to the legal foundations. Compare *ante* at 20.) Services cost money to provide: union representatives must be paid, union lawyers must be paid, and collective bargaining is not free. Justice Scalia flagged this problem in his separate opinion in *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507 (1991) (concurring in judgment in part, dissenting in part):

> Where the state imposes upon the union a duty to deliver services, it may permit the union to demand reimbursement for them; or, looked at from the other end, where the state creates in the nonmembers a legal entitlement from the union, it may compel them to pay the cost. The "compelling state interest" that justifies this constitutional rule is not simply elimination of the inequity arising from the fact that some union activity redounds to the benefit of "free-riding" nonmembers; private speech often furthers the interests of nonspeakers, and that does not alone empower the state to compel the speech to be paid for. What is distinctive, however, about the "free riders" who are

nonunion members of the union's own bargaining unit is that in some respects *they* are free riders whom the law *requires* the union to carry – indeed, requires the union to go *out of its way* to benefit, even at the expense of its other interests. In the context of bargaining, a union *must* seek to further the interests of its nonmembers; it cannot, for example, negotiate particularly high wage increases for its members in exchange for accepting no increases for others. Thus, the free ridership (if it were left to be that) would be not incidental but calculated, not imposed by circumstances but mandated by government decree.

*Id.* at 556. *Lehnert* itself dealt with limitations on the use by public-sector unions of dissenters' contributions. The Court's holding that the state constitutionally was not permitted to compel its employees to subsidize legislative lobbying or other political activities in no way undermines the force of Justice Scalia's observations about the free-rider problem as it relates to the representational services that the unions must provide to nonmembers.

Acting wholly within the boundaries of the governing legislation, the Supreme Court has reconciled the costly duties imposed by law on unions with the rights of workers who do not wish to participate in (or pay for) that union's nonrepresentational activities. It has done so by drawing a line between what non-union members of a bargaining unit can and cannot be compelled to pay the union. Pursuant to section 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3), unions and employers may require all employees within a bargaining unit (union members and nonmembers alike) to pay the union for the costs associated with the union's collective bar-

gaining and contract administration functions. See, *e.g.*, *Beck*, 487 U.S. at 738. *Beck* held that although section 8(a)(3) of the Act permits an employer and a union to enter into an agreement under which all employees must make certain payments to the union (essentially reimbursing the union for services promised and rendered), it does not permit the union to collect funds from objectors for activities "unrelated to collective bargaining, contract administration, or grievance adjustment." *Id.*

My colleagues believe that *Beck* characterizes those objectors as union "members," and indeed at one point the Court says that "the 'membership' that may be so required [by section 8(a)(3)] has been 'whittled down to its financial core.'" *Id.* at 745. But all the Court is talking about at that point in the opinion is what can be compelled of employees. Elsewhere, it makes clear that the *Beck* objectors were not union members. How else can one read the statement at the beginning of the opinion, where the Court says "[i]n June 1976, respondents, 20 employees who chose *not* to become union members, initiated this suit … ." *Id.* at 739 (emphasis added). The majority has effectively deleted from the Court's *Beck* opinion its statement of the precise issue it was deciding:

> Today we must decide whether this provision also permits a union, over the objections of dues-paying *nonmember* employees, to expend funds so collected on activities unrelated to collective bargaining, contract administration, or grievance adjustment, and, if so, whether such expenditures violate the union's duty of fair representation or the objecting employees' First Amendment rights.

*Id.* at 738 (emphasis added).

To justify its decision to assign the status of statutory "members" to nonmembers of the union, the majority seizes on the comment to which I just referred, to the effect that the 1947 amendments to the NLRA "whittled down" the term "membership" in the statute to its "financial core." This language came directly from *NLRB v. General Motors Corp.*, 373 U.S. 734, 742 (1963), and so in order to understand it, we must look at that decision. When one does so, it is apparent that the majority's reading cannot stand. Nothing in either *General Motors* or *Beck* wiped out the concept of *non*member in the course of defining the term "member." The passage in *General Motors* from which that quote is lifted is prefaced by the statement that "[u]nder the second proviso to § 8(a)(3), the burdens of membership upon which employment may be conditioned are expressly limited to the payment of *initiation fees and monthly dues*." *Id.* (emphasis added). The Court did not equate "initiation fees and monthly dues" to the fair-share payment that it recognized a quarter century later in *Beck.* The only point it was making in *General Motors* was that a duty to pay both initiation fees and monthly dues was enough to make someone a "member," even if the union disclaimed the idea that membership went along with those payments. Reality, in other words, is what governs; not labels. Unsurprisingly, people who are compelled to pay precisely the same amount as union members pay should be considered *de facto* members. With this background in mind, the majority's rationale for disregarding the Court's own description of the issue that it decided in *Beck* falls apart. *Beck* makes clear that objectors are *not* members, but that they can be compelled to pay for the services that they consume.

In so doing, *Beck* fine-tunes the rules governing a recognized union, on the one hand, and the nonmembers for

whom the union is responsible, on the other. It does so by holding that while the collection of dues unrelated to collective bargaining (and other representational activities such as the handling of grievances) would violate the First Amendment rights of the nonmembers, federal law nevertheless entitles the union to collect fees "fixed by their underlying purpose—defraying the costs of collective bargaining." *Beck*, 487 U.S. at 759. Interestingly, the Court alluded to the free-rider issue when it recognized that the legislative justification for section 8(a)(3) was to "ensur[e] that nonmembers who obtain the benefits of union representation can be made to pay for them … ." *Id*.

Before turning to the way in which these principles apply to the case before us, I add a few words about the Supreme Court's recent decision in *Harris v. Quinn, supra.* The question in *Harris* was "whether the First Amendment permits a State to compel personal care providers to subsidize speech on matters of public concern by a union that they do not wish to join or support." 134 S. Ct. at 2623. The Court answered that question in the negative. It held that the personal care workers could not be required to pay even the agency fee that *Abood* had authorized, in the unusual circumstances of their workplace. The Court stressed the fact that the difference between core union speech and issues such as wages, pensions, and benefits for public employees is far more elusive than it is for private employees. It commented on "the conceptual difficulty of distinguishing in public-sector cases between union expenditures that are made for collective-bargaining purposes and those that are made to achieve political ends." *Id.* at 2632. The Court also found significant the fact that the personal care assistants were hardly public employees at all: they were hired, fired, and supervised by

the client, and they were not eligible for a host of state bene-
fits. This unusual status, it wrote, "has important implica-
tions" for the ability of the union to charge an agency fee. *Id.*
at 2636. *Abood*'s rationale "is based on the assumption that
the union possesses the full scope of powers and duties gen-
erally available under American labor law." *Id.*

In *Harris*, practically the only thing the union was doing
was presenting its views to the state. It could not set wages,
which were established by law, and it had no authority over
grievances. In that setting, all that was left was speech. Well-
established principles entitled the objectors to refuse to pay a
fee that could only be subsidizing that speech. The Court
uncovered nothing of value that the union was compelled to
furnish to the objectors, and so it had no occasion to worry
about any compelled transfer of property or services.

The case before us does not share those distinguishing
features of *Harris.* It concerns private employers and private
employees, not state employees. The rights of employees
who are not union members to refrain from subsidizing un-
ion speech are fully protected by their entitlement to give the
union only a "fair share" that is capped by the costs of repre-
sentational activity. The *Harris* Court itself recognized that
the case before it lacked all of the features that have been
understood to justify the agency fee:

> What justifies the agency fee, the argument goes, is
> the fact that the State compels the union to promote
> and protect the interests of nonmembers. *Ibid*. Specifi-
> cally, the union must not discriminate between mem-
> bers and nonmembers in "negotiating and adminis-
> tering a collective-bargaining agreement and repre-
> senting the interests of employees in settling disputes

and processing grievances." *Ibid.* This means that the union "cannot, for example, negotiate particularly high wage increases for its members in exchange for accepting no increases for others." *Ibid*. And it has the duty to provide equal and effective representation for nonmembers in grievance proceedings, see Ill. Comp. Stat. Ann., ch. 5, §§ 315/6, 315/8, an undertaking that can be very involved. See, *e.g.,* SEIU: Member Resources, available at www.seiu.or/a/members/ disputes-and-grievances-rights-procedures-and-best-practices.php (detailing the steps involved in adjusting grievances).

134 S. Ct. at 2636–37. Every one of the features that was missing in *Harris* is present in the case before us. I therefore conclude that nothing in *Harris* undermines either *Beck* or the analysis I have described thus far.

## II

The question before us is how these principles operate when a state chooses to adopt a so-called "right-to-work" law (either by statute or in its constitution). Indiana has passed such a law. See IND. CODE § 22-6-6. Federal law leaves some room for such state laws, pursuant to section 14(b) of the NLRA, 29 U.S.C. § 164(b). But the question is whether state law can command the union (a private organization) to perform uncompensated services for other private parties (the nonmembers). If the federal labor laws preempt this kind of state law, then the state law must yield. If the federal statute either authorizes this kind of taking or is silent, then we must move to the constitutional issues to which I have alluded.

Bearing in mind that we should always consider statutory arguments first, see, *e.g.*, *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 162 (2001), I analyze the NLRA before tackling any constitutional issue. We all agree that the pivotal section of the NLRA is section 14(b), 29 U.S.C. § 164(b). Section 14(b) was added to the NLRA in 1947 by the Taft-Hartley Act, 61 Stat. 151, as part of an effort to rein in certain union practices that Congress regarded as abusive. Entitled "Agreements requiring union membership in violation of State law," section 14(b) states that:

> Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring *membership* in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

29 U.S.C. § 164(b) (emphasis added). This is the language that we must construe. The question is what it means to say that states can prohibit agreements requiring "membership" in a labor organization as a condition of employment. More particularly, we must decide whether section 14(b) authorizes the sweeping prohibitions found in Indiana's Right to Work law. Plaintiffs challenge both section 3 and section 8 of that law, Ind. Code §§ 22-6-6-3 and 22-6-6-8, but I agree with the majority that section 3 adds nothing to the picture. I therefore focus on subparts 2 and 3 of section 8, which provide as follows in relevant part:

> A person may not require an individual to:

> …

(2) pay dues, fees, assessments, or other charges of *any kind or amount* to a labor organization; or

(3) pay to a charity or third party an amount that is equivalent to or a pro rata part of dues, fees, assessments, or other charges required of members of a labor organization;

as a condition of employment or continuation of employment.

IND. CODE § 22-6-6-8 (emphasis added).

"Statutory interpretation begins with the plain language of the statute." *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008). Courts should assume that "the purpose of the statute is communicated by the ordinary meaning of the words Congress used; therefore, absent any clear indication of a contrary purpose, the plain language is conclusive." *United States v. Ye*, 588 F.3d 411, 414–15 (7th Cir. 2009). My colleagues read the word "membership" oddly, as a word that describes both union members and nonmembers of the union. Nonmembers somehow morph into members, they say, if the nonmembers are required to pay the union *anything,* even a fee limited to reimbursement for the services that federal law insists they are entitled to receive from the union. By this logic, I become a member of Chicago's University Club the minute I so much as pay for my dinner at an event hosted there. This would come as a surprise to both the Club and me. One might even ask if money is significant at all: I assume that nonmembers who enjoy union services for free fall outside even the majority's definition of "membership," though I do not know why that should be the case, if they are still being represented by the union. The majority

believes that its interpretation of section 14(b) is compelled by the language of the NLRA, as interpreted by the Supreme Court. In addition, it relies very heavily on the legislative history of the Taft-Hartley Act, *ante* at 13–18. With respect, I do not agree with its reading of the statutory language, and I cannot agree that the legislative history has any particular persuasive value.

The decisions known as *Retails Clerks I* and *II* marked the first time the Supreme Court addressed a state's power under section 14(b). See *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 373 U.S. 746 (1963) (*Retail Clerks I)* and *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 96 (1963) (*Retail Clerks II*). In *Retail Clerks I* the Court reviewed an agency-shop agreement under which all employees at the company were required to pay full union fees, whether or not they were union members. The Court had held in *General Motors* that an agency shop clause that was not prohibited by state law was a permissible subject of collective bargaining. 373 U.S. at 735. But *General Motors* arose in Indiana, which at the time permitted agency-shop agreements; *Retail Clerks I*, in contrast, arose in Florida, which has a right-to-work law that forbade these arrangements. Relying on section 14(b) and the right-to-work legislation, the plaintiffs (non-unionized employees) brought a lawsuit seeking a declaration that the agency-shop provision was void. Defendants argued, *inter alia*, that section 14(b) gave states only the power to prohibit agreements that required "membership" in labor organizations. Agency-shop agreements, defendants pointed out, did not require membership; they "merely" required nonmembers to pay fees equal to membership fees. This, defendants urged, was compatible with the statute.

The district court found that the state's right-to-work law outlawed not only union shops (under which union membership could be compelled) but also agency shops. The Supreme Court affirmed, finding that "[a]t the very least, the agreements requiring 'membership' in a labor union which are expressly permitted by the proviso [to 8(a)(3)] are the same 'membership' agreements expressly placed within the reach of state law by § 14(b)." 373 U.S. at 751. Pointing to *General Motors*, the Court found that agency-shop arrangements "which impose[] on employees the only membership obligation enforceable under § 8(a)(3) by discharge, namely, the obligation to pay initiation fees and regular dues – is the 'practical equivalent' of an 'agreement requiring membership in a labor organization as a condition of employment.' *Whatever may be the status of less stringent union-security arrangements*, the agency shop is within § 14(b)." *Id.* at 751–52 (emphasis added).

As the statement just highlighted demonstrates, the Court was careful in *Retail Clerks I* to leave for another day the status of less comprehensive arrangements. It observed that the petitioners originally had likened their case to the *General Motors* agency shop. 373 U.S. at 752 n.4. Only later, upon briefing and argument, did they try to distinguish their situation from the full-blown agency shop. *Id.* At that late hour, they argued that the clause in their agreement provided that nonunion employees would contribute to the union "for the purpose of aiding the Union in defraying costs in connection with its legal obligations and responsibilities as the exclusive bargaining agent of the employees in the appropriate bargaining unit." *Id.* at 752. The petitioners asserted that this language confined payments from nonmembers "to collective bargaining purposes alone" and prohibited the

union from using the payments "for institutional purposes unrelated to its exclusive agency functions." *Id.*

The Supreme Court rejected this last-minute attempt to distinguish *General Motors*. It pointed out that contrary to the petitioners' suggestion, the clause at issue imposed "no iron-clad restriction" on what the union could do with the payments it received from nonmembers, and thus there was no safeguard against the union's use of the money for "institutional items." *Id.* at 753. In addition, because the proposed "service fee" was set at an amount equal to the union's initiation fees and dues, which could be used for any number of purposes, there was no guarantee that a nonmember would not pay more of the union's collective bargaining costs "than his *pro rata* share." *Id.* at 754. The Court explained:

> If the union's total budget is divided between collective bargaining and institutional expenses and if nonmember payments, equal to those of a member, go entirely for collective bargaining costs, the nonmember will pay more of these expenses than his *pro rata* share. The member will pay less and to that extent a portion of his fees and dues is available to pay institutional expenses. The union's budget is balanced. By paying a larger share of collective bargaining costs the nonmember subsidizes the union's institutional activities.

*Id.* Accordingly, there was no reason why the clause should, "in the present posture of the case, be construed against respondent to raise a substantial difference between this and the *General Motors* case." *Id.* at 752. It would be anomalous, the Court said, to let a state ban agency-shop agreements under which union members and nonmembers paid equal

shares while forbidding it to ban an arrangement in which nonmembers might pay even more bargaining costs than members. *Id*. at 754.

*Retail Clerks I* thus stands only for the proposition that a union may not do an end-run around section 14(b) by imposing financial exactions on nonmembers exactly equal to the charges borne by members. As I already have noted, *Retails Clerks I* reserved the status of more genuine accommodations to nonmembers for another day. This is that day, for our court. Indiana's flat prohibition against agreements between employers and unions under which a union nonmember cannot be charged even for legally required and *bona fide* representational activities goes well beyond the *de facto* membership the Supreme Court considered in *Retail Clerks I.*

Well-established principles of labor preemption also stand in the way of the majority's result. While there is no express preemption clause in the NLRA, the Supreme Court has recognized that its preemptive reach is broad. See Benjamin I. Sachs, *Despite Preemption: Making Labor Law in Cities and States*, 124 HARV. L. REV. 1153, 1154 ("It would be difficult to find a regime of federal preemption broader than the one grounded in the … (NLRA)"). In *Garmon*, the Supreme Court held that states may not regulate activities even "arguably" protected or prohibited by federal labor law. *San Diego Bldg. Trades Council, Etc. v. Garmon*, 359 U.S. 236, 245 (1959). In *Machinists*, it went even further, finding that state regulation of union activity that was neither protected nor prohibited by federal labor law was preempted, as "Congress intended that the conduct be … left 'to be controlled by the free play of economic forces'" and "not be regulable by

States any more than by the NLRB." *Lodge 76, Int'l Ass'n of Machinists v. Wis. Emp't Relations Comm.*, 427 U.S. 132, 149 (1976). Against this backdrop, I believe that we are not free to read section 14(b) as the majority does. It is instead a narrow exception to an otherwise encompassing preemption regime.

In other section 14(b) cases courts have struck down similarly restrictive state laws as outside the scope of section 14(b) and therefore preempted. For example, in *N.L.R.B. v. Houston Chapter, Associated Gen. Contractors of Am., Inc.*, 349 F.2d 449 (5th Cir. 1965), the Fifth Circuit held that a demand for a nondiscriminatory hiring-hall clause by the union did not fall within the area carved out for state regulation by section 14(b) and thus the state was preempted from banning it. The court explained its decision as follows:

> It is true that the terms of § 14(b) as well as the legislative history suggest the intent on the part of Congress to save to the states the right to prohibit compulsory unionism. However, the long and the short of this matter is that § 14(b) contemplates only those forms of union security which are the practical equivalent of compulsory unionism. Membership in the union is not compulsory under the clause here in question. … No doubt union membership will be encouraged under the arrangement, indeed it may be a boon to the union; nevertheless such an arrangement does not constitute compulsory unionism so long as the arrangement is not employed in a discriminatory manner.

*Id.* at 453 (internal citations omitted). The Eighth Circuit made the same point in *Laborers' International Union, Local*

*107 v. Kunco, Inc.*, 472 F.2d 456 (8th Cir. 1973), where it commented that "[s]ection 14(b) does not empower states to ban all involuntary relationships between workers and unions. It merely allows the prohibition of 'agreements requiring *membership* in a labor organization as a condition of employment … .'" *Id.* at 458. See also *Local Union No. 415 of Int'l Bhd. of Elec. Workers v. Hansen*, 400 P.2d 531, 536–37 (Wyo. 1965) (finding preempted statute providing that "no person is required to have any connection with" a labor organization as a condition of employment or continued employment).

It is true, as my colleagues point out, that the Court of Appeals for the District of Columbia decided 32 years ago that the assessment of even representational fees against nonunion members was an unfair labor practice in a right-to-work state. See *Int'l Union of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the U. S. & Canada, Local Unions Nos. 141, 229, 681, & 706 v. N.L.R.B.*, 675 F.2d 1257, 1267–68 (D.C. Cir. 1982). But the *Plumbing & Pipefitting* decision cannot be reconciled with the Supreme Court's later *Retail Clerks* decisions nor with the distinction that *Beck* drew between the limited obligations that nonmembers retain and those voluntarily borne by union members. Judge Mikva's dissenting opinion was, in my view, prescient; it also provides a useful and comprehensive review of the legislative history of section 14(b) that supports the conclusion he would have reached (and that I reach here). See *Id.* at 1268–75. Rather than repeat Judge Mikva's account, I mention only a few of the highlights for the benefit of those who regard legislative history as a useful tool, in order to illustrate the fact that the pieces of legislative history the majority has found do not represent either the last or the only way to look at it.

As I noted at the outset, modern American labor law began with the passage of the Wagner Act in 1935. Enacted against the backdrop of significant violence between workers and employers at the beginning of the 20th century, the Wagner Act gave workers the right to organize in unions and to bargain collectively with their employers. After World War II, however, there was a feeling by some in Congress that the pendulum had swung too far in the direction of unionization. In particular, closed-shop agreements, under which an employer agreed to hire union members only, were thought by some members of Congress to be a powerful tool that union leaders were abusing. On the other hand, the very same members of Congress were sympathetic toward other union security agreements. In response, Congress passed the Taft-Hartley Act of 1947, 61 Stat. 151. Taft-Hartley introduced many changes to the NLRA, some administrative, some substantive. Like most legislation, it reflected a compromise, in this case between union and management interests. Congress "added provisions making it more difficult for workers to obtain a union shop (*i.e.*, a workplace in which the employer is free to hire anyone, but new employees can be required to join the union after hire), but [] retained the union shop as a mandatory subject of bargaining in section 8(a)." *Plumbing & Pipefitting Indus.*, 675 F.2d at 1272.

The legislative history of section 14(b) indicates that the drafters understood it as a reaffirmation of the original NLRA:

It was never the intention of the National Labor Relations Act, as is disclosed by the legislative history of that act, to preempt the field in this regard so as to

> deprive the States of their powers to prevent compul-sory unionism. Neither the so-called "closed shop" proviso in section 8(3) of the existing act nor the un-ion shop and maintenance of membership proviso in section 8(a)(3) of the conference agreement could be said to authorize arrangements of this sort in States where such arrangements were contrary to the State policy. To make certain that there should be no ques-tion about this, section 13 was included in the House bill. The conference agreement, in section 14(b), con-tains a provision having the same effect.

*Id.* at 1272 (citing H.R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 60 (1947), Leg. Hist. at 564). As Judge Mikva pointed out, the "predominant if not the only purpose of section 14(b) was to provide yet one more check on the abuses that could exist under compulsory unionism." *Id.* at 1273. But what did that mean? Congress did not define what it meant by the key term for our purposes, "compulsory unionism." Individual members, however, gave examples indicating that they were thinking of the closed shop or occasionally the union shop; no one breathed a word about the legitimacy of requiring nonmembers of the union to pay for services that the union was legally compelled to give them.

The majority notes that as of the time Taft-Hartley was under consideration, 12 states had right-to-work laws in ef-fect, and that the laws of seven in that group included lan-guage similar to that found in the Indiana law before us. *Ante* at 12–13. From this fact, it infers that Congress must have intended to endorse all 12 of the state laws in effect. But we have no idea what Congress as a whole thought, and in the end it is beside the point. We can assume that some

members who voted for Taft-Hartley believed, or hoped, that each one of the 12 state laws would be free to operate in the broadest possible way. Others who voted for the bill might have expected each state statute to be tested in the courts, which after all are the institution with the final authority to "say what the law is." *Marbury v. Madison*, 1 Cranch (5 U.S.) 137 (1803). Since the language varied from statute to statute, the latter expectation would have been far from unreasonable. "Statutes are drafted by multiple persons, often with conflicting objectives." Frank H. Easterbrook, *Judges as Honest Agents*, 33 HARV. J.L. & PUB. POL'Y 915, 922 (2010). The safest course is therefore to look at the language of the statute, in context of course, and to reason from there.

As the line the Supreme Court drew between the *General Motors* decision and the *Retail Clerks* case demonstrates, section 14(b) allows states to opt out of anything resembling a union shop or an agency shop. But it does not permit them to allow any worker who wishes to free-ride on the union's mandatory efforts on the nonmember's behalf to do so. Without the protection of section 14(b), sections 8(2) and (3) of the Indiana statute must fall under normal preemption analysis.

## III

If, contrary to my analysis, one were to conclude that Indiana has worked out a way to conscript the union into providing uncompensated services to anyone who decides to opt out of union membership, it would become necessary to decide whether such a rule is permissible under the Takings Clause of the Fifth Amendment, as applied to the states under the Fourteenth Amendment. The majority is suffi-

ciently worried about this possibility that its first response is to suggest that the plaintiffs have forfeited the point. *Ante* at 19–20. I disagree with them. First, we are not compelled to invoke forfeiture rules in civil cases, and given the importance of this question, I would not duck the issue on that basis. Second, plaintiffs have argued throughout that the Indiana statute is unconstitutional, and at least one Indiana court has come to the conclusion that it indeed effects a taking under the state constitution. See *Sweeney v. Zoeller*, No. 45D01-1305-PL-52 (Super. Ct. of Lake Cnty. Sept. 5, 2013). Plaintiffs called that decision to our attention. If the law falls on state grounds, so be it; our case will be moot. But if the higher state courts ultimately uphold the law under the state constitution, however, the federal constitutional issue will remain. In my view, the issue has been preserved adequately and even if it has been raised only indirectly, we should reach it.

Given the IOLTA cases and the confiscatory nature of the Indiana statute, which requires unions to provide services for free to the objectors, if there is no preemption, then I would feel compelled to find a taking. (Principles of federal preemption do not permit us to use the justification that the majority raises: they believe that this is all the fault of the duty of fair representation in federal law. *Ante* at 20. But it is not up to the state to override that duty; we must take it as a given.) The two most basic economic rights enjoyed in the United States are (1) that the government may not confiscate private property for public use without just compensation, and (2) that the takings power must be exercised for a public purpose, and so the government may not take the property of one private party for the sole purpose of transferring it to another private party, regardless of whether "just"

compensation is paid. See *Kelo v. City of New London, Conn.*, 545 U.S. 469, 477 (2005). The majority, unfortunately, has given a green light to just such an uncompensated private transfer. It does so by holding that states can categorically prohibit unions and employers from requiring nonmembers to reimburse the union for the costs the union is federally obligated to incur. Even in *Kelo*, the taking of one person's property in order to transfer it to a second private party was justified by the alleged public purpose of economic redevelopment. See *id.* at 494 (O'Connor, J., dissenting). Here, no public purpose is even alleged.

How this can be anything but an unconstitutional taking I do not know. I am aware of no precedent in other areas to support it. We would be shocked by a rule providing that, as a condition of receiving a business license in a city, a company selling gasoline had to give it away to any customer who did not want to pay. Or, to take another example, think of the cooperative buying associations that small businesses often create so that they can enjoy economies of scale. See, *e.g., Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284 (1985). Under the majority's rule, a state could compel the association to furnish products even to nonmembers—perhaps even for free—if that nonmember objected to an association rule requiring all members to include contraceptive services in their health insurance plans. The representational services that unions provide cost real money. That is most apparent when the grievance process is at stake, but the negotiation of a collective bargaining agreement cannot be done at zero cost.

The majority makes the surprising assertion that the union's "seat at the bargaining table" somehow compensates it

for the myriad real costs it incurs on behalf of nonmembers. *Ante* at 20–21. That idea does not hold up under any level of scrutiny. First, this suggestion fundamentally misunderstands how the union obtains its seat at the bargaining table. The union does so if and only if it succeeds in winning a representational election sponsored by the NLRB; it does not win that seat either through the grace of the employer or in exchange for some kind of *quid pro quo* from either the employer or the bargaining-unit employees (*i.e.*, "you cover the expenses of collective bargaining and grievance processing, and in exchange we'll let you participate in the process"). Second, the majority seems to think that the employer receives no benefits from collective bargaining, but that is not true either. Collective bargaining agreements commonly include such features as no-strike clauses, management rights clauses, and a grievance procedure, all of which are a win-win for both labor and management. Third, the majority's hypothesis is flatly inconsistent with the Supreme Court's reasoning in *Beck* and *Abood*, among other cases that recognized the tangible value of the services that nonmembers and objectors receive as a result of the duty of fair representation. Finally, even if there were anything to the point, it would apply at most to the collective bargaining portion of the union's duties, not to the administration of the contract and the costly grievance procedures. For all these reasons, the majority cannot avoid the confiscatory regime it has endorsed by pointing to a certified union's right to represent the workers.

None of this would be a problem if unions were permitted to deny services to nonmembers, but they are not, and I am not sure they would want to be. (That, however, is a question for another institution and another day.) Unless or

until that aspect of our labor law is changed by Congress, the only constitutional path is to permit unions to charge fees to nonmembers that cover only the limited, mandatory representational services that the nonmembers receive. The majority has forbidden this, and has thus sanctioned the confiscation of one private party's resources for the benefit of another private party. I cannot sign on to that result.

## IV

As I have explained, I do not agree with the majority's decision to define the term "member" for purposes of section 14(b) to include both members and nonmembers. The Supreme Court's decisions in *Retail Clerks* and *Beck,* as well as its decisions in *Phillips* and *Brown,* point us in the right direction. Under them, the proper accommodation between state authority to adopt a "right-to-work" approach and the national labor laws is one under which the states may insist that no employee be required to become a member of a union, but at the same time, nonmembers must pay for the services that the unions are required by law to render to them. Supreme Court precedent, Board precedent, and the legislative history of the statute all support this approach. And if it is wrong and the majority is correct, we have a constitutional problem on our hands. In our country, the state is not entitled to force private organizations or persons to render uncompensated services to others. The Takings Clause, which applies to the states, says as much. Principles of constitutional avoidance therefore support the ruling that I advocate. If Congress wants to amend the federal labor laws to permit unions to serve only those who pay their dues, I assume that it could do so. But that is not the legal regime we have today.

For all these reasons, I respectfully dissent.